UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____
                               )
DONALD GLASS,                  )
                               )
            Plaintiff,          )
                               )
        v.                      )        CIVIL ACTION
                               )        NO. 1:12-cv-01332-WGY
CAROLYN W. COLVIN,             )
Acting Commissioner of Social  )
Security,                       )
                               )
            Defendant.          )
_____)


WILLIAM G. YOUNG, U.S. District Judge[1]        October 21, 2014

MEMORANDUM AND ORDER

I.   INTRODUCTION

    Donald Glass ("Glass") brings this action pursuant to

section 205(g) of the Social Security Act, 42 U.S.C. § 405(g),

seeking judicial review of the final decision of the

Commissioner of the Social Security Administration

("Commissioner")[2] denying him disability insurance benefits

_____

        [1] Of the District of Massachusetts, sitting by designation.
Order Reassigning Case, ECF No. 12.

        [2] The named defendant in this suit was originally Michael J.
Astrue, who was the Commissioner of Social Security at the time
the suit was filed.  On February 14, 2013, Carolyn W. Colvin was
named Acting Social Security Commissioner and has therefore been
substituted as the named defendant in this suit pursuant to
Federal Rule of Civil Procedure 25(d).  See Def.'s Answer 1 n.1,
ECF No. 8.

("DIB") and Supplemental Security Income ("SSI").  Glass

challenges the determination of an Administrative Law Judge (the

"hearing officer") that Glass is not disabled within the meaning

of the Social Security Act.  Glass requests that the Court

reverse the decision and order a calculation of benefits in

accordance with the requirements of the Social Security Act, or,

alternatively, vacate the decision and remand the matter for

further proceedings.  Compl. 5-6, ECF No. 1; Pl.'s Br. 21, ECF

No. 13.  The Commissioner requests that the Court grant her

motion for judgment on the pleadings and affirm her decision

that Glass is not entitled to disability insurance benefits.[3]

Mem. Law Supp. Acting Comm'r's Mot. J. Pleadings ("Comm'r's

Mem.") 1, ECF No. 15.

## A.    Procedural Posture

Glass applied for DIB and SSI on October 5, 2009, with a

protective filing date of the same day.[4]  Admin. R. 98, 107.  On

---

[3] The Commissioner did not file with the Court a separate
motion for judgment on the pleadings.  For the purposes of this
order, however, the Court will regard the Commissioner's
memorandum as having incorporated the referenced motion.

[4] This Court notes that the Disability Determination
Transmittal lists the filing date of Glass's claim as May 11,
2009.  Admin. R. 65.  The hearing officer mentioned this date in
his decision.  Id. at 17.  The Commissioner also mentioned this
date in her memorandum.  Comm'r's Mem. 1 n.1.  The Applications
for DIB and SSI, however, list the filing date as October 5,
2009.  Admin. R. at 98-107.  In his brief, Glass notes this
discrepancy and relies on the date listed on the Applications.
Pl's Br. 2 n.2.  This Court does the same, assuming that the

February 4, 2010, the Regional Commissioner denied Glass's claim. Id. at 66-72. Glass timely filed a request on February 9, 2010, for a hearing before an Administrative Law Judge to challenge the Regional Commissioner's denial. Id. at 74-75. A hearing was held on November 2, 2010, at which Glass appeared accompanied by legal aid counsel. Id. at 17, 30-63. On January 6, 2011, the hearing officer issued a decision ruling Glass not disabled and upholding the denial of benefits. Id. at 14-25. Glass timely filed a request on March 1, 2011, for the Social Security Appeals Council to review the hearing officer's decision. Id. at 12-13. On June 26, 2012, the Appeals Council denied Glass's request for review. Id. at 1-6.

On August 27, 2012, Glass filed the present action pursuant to 42 U.S.C. sections 405(g) and 1383(c)(3). Compl. 1, 6. The Commissioner filed an answer on May 15, 2013, Def.'s Answer, ECF No. 8, and both sides subsequently filed briefs with the Court, Pl.'s Br; Comm'r's Mem. On June 25, 2013, the case was reassigned to this Court. Order Reassigning Case, ECF No. 12.

### B. Factual Background

Glass was born in 1982 and was twenty-seven years old when he applied for benefits. See Admin. R. 100. Glass graduated from high school with an Individualized Education Program (the

---

correct date is the one indicated on the Applications themselves. The Court also observes that the parties are not in dispute over whether Glass's application was timely received.

"individualized program") diploma, due to learning disability.
Id. at 38; see also id. at 399-402, 407-412. He also took a
vocational course in auto mechanics. Id. at 39. He began
working a variety of jobs involving manual labor, including
working as an auto mechanic. See id. According to Glass, his
ailments always interfered with his work. Id. at 41, 150. In
2008, he worked for some months inflating bounce houses at
Bounce Around, Inc., and was laid off at the end of the summer
season. Id. at 133, 150-151. Following his departure from
Bounce Around, he was let go from his position as a tire
technician from Kost Tire[5] in Saratoga, New York, after having
his pacemaker replaced in December 2008. Compl. 3; Admin. R.
40-41. He has not worked since this time. Admin. R. 41.

1. **Impairments**

a. **Physical Disability**

The primary physical ailments for which Glass has sought
medical treatment are Wolff-Parkinson-White syndrome (a defect
in the heart's electric conduction system) and a separate defect
in his mitral valve. Compl. 4. In a report dated June 2000 –
when Glass was seventeen years old – Dr. James J. O'Brien ("Dr.
O'Brien"), Glass's treating physician, stated that by then Glass
had already undergone "three separate ablations from an

_____

[5] It is not clear from the record whether the name of the
company is Kost Tire or Coast Tire. The Court adopts the
former, while noting the difference is irrelevant to the case.

endocardial approach," all of which were unsuccessful in fixing the problems these defects created in his heart's rhythms. Admin. R. 232.

According to a report signed by Dr. Matthew Farina ("Dr. Farina"), dated March 2003, Glass "had a congenitally abnormal cleft mitral valve which was initially repaired in Boston, but because of progressive severe insufficiency following surgery[,] mitral valve replacement was carried out at Albany Medical Center Hospital in June of 2000." Id. at 224. Following the valve replacement, however, Glass continued to experience cardiac problems, leading to an ablation in May 2001. Id.

In 2004 and the following years, his health appeared to stabilize. See id. at 247-254. By the end of 2007, Dr. O'Brien observed that Glass had been absent for over a year and a half, had not been taking his medication, and had been smoking, but still felt well. Id. at 258. Dr. O'Brien then explained to Glass the importance of both not smoking and taking his medication. Id. at 259. On January 3, 2008, Glass complained of some fatigue with work and had the pacemaker generator replaced, being discharged home in stable condition the following day. Id. at 261, 263, 266. Twelve days after his discharge, Glass was seen by Dr. O'Brien, who then noted Glass was "doing very well." Id. at 270.

On October 11, 2008, however, Glass received treatment at
the Saratoga Hospital, during an episode of heart unrest that
caused lightheadedness and shortness of breath.  Id. at 237.
Dr. Todd Duthaler ("Dr. Duthaler") noted that Glass had
complained that the episode had begun two days before.  Id.  Dr.
Duthaler stated that the initial cardiac monitor showed
tachycardia at approximately 200 beats per minute.  Id. at 238.
After some failed attempts with different medications, the heart
rhythm was finally controlled.  See id.  Glass was then
discharged against medical advice.  Id.

Nine days later, Glass consulted with Dr. O'Brien, who
observed that, apart from that episode, Glass was feeling well.
Id. at 272.  On May 18, 2009, Glass visited Dr. O'Brien again,
complaining of palpitations at home.  Id. at 365.  Dr. O'Brien
commented that Glass was having "recurrent episodes of atrial
fibrillation."  Id. at 366.  On March 11, 2010, Dr. O'Brien
noted that Glass was stable, although "[h]is blood pressure
[was] up a little bit."  Id. at 364.  During another
consultation, dated August 25, 2010, the doctor observed that
Glass would be a "[p]otential candidate for disability since the
stress of work seem[ed] to make his arrhythmias worse."  Id. at
362.  Dr. O'Brien also noted that Glass was "short of breath
with any activity and [had] easy fatigability."  Id.  On
December 15, 2010, Dr. O'Brien wrote that "[Glass was] still

bothered by stress and physical exertion" and "encouraged him to

start walking more." Id. at 539.[6]

### b. Learning Disability

It is not clear when Glass's learning disability was

detected but, starting in 1997, Glass was included in the

special education individualized program in the Ballston Spa

Central School District (the "school"). Id. at 499-500. From

that point until March 2001, there is robust documentation

regarding Glass's progress under the program. See id. at 407-

507. Usually, the assessments would grade his development under

---

[6] As far as the period relevant to Glass's current claim for
benefits is concerned, this is where the account finishes. It
must be noted, however, that after January 6, 2011 - the date of
the hearing officer's decision and thus the end of the relevant
period - Glass's situation seems to have worsened. This Court
briefly describes the facts found in the record concerning
Glass's impairments postdating the relevant period.

On March 24, 2011, Glass was again admitted to the Saratoga
Hospital, "complain[ing] of 48 hours of rapid, irregular heart
[rhythm]." Id. at 511. The physical exam found "a rapid
irregular rhythm on the monitor, about 160 beats per minute."
Id. The episode was eventually controlled and Glass left the
hospital the following day. See id. at 518-520.

On the last available report from Dr. O'Brien, six days
after the episode, the doctor acknowledged that Glass's health
had worsened. See id. at 536 ("[Glass] is struggling. He had
palpitations. [He w]as in atrial fibrillation. Ventricular
rate was in the 150s."). Accordingly, Dr. O'Brien decided to
change some medications and see Glass again in two weeks. Id.
at 537.

The Administrative Record also contains a prescription
dated August 22, 2011, in which Dr. O'Brien states, in
conclusory fashion, that "Mr. Glass cannot work due to cardiac
disability." Id. at 217.

the rubrics "good progress"[7] or "some progress."  See, e.g., id. at 470-486.

During that period, Pamela R. Lott ("Ms. Lott"), the school psychologist, twice evaluated Glass.  She made her first evaluation in April 1997.  Id. at 403-406.  Ms. Lott noted that Glass had attended the school since kindergarten, and that "[a] second grade retention and placement in inclusion classes for grades 3-5 [were] noted in his school records."  Id. at 403.  On her evaluation, Ms. Lott placed Glass within the low average range of cognitive skills, noting also "[a] significantly low Distractibility Index . . . [which] suggest[s] weaknesses on tasks that require attention and concentration."  Id. at 406. She also observed a discrepancy "between his mathematical skills versus the language-based academics," noting that his delay in the latter was more accentuated than in the former.  Id. Finally, she found Glass to have a normal social-emotional profile, id. at 405, being sensitive about his reading disability while taking pride on his mechanical ability and artistic interests.  Id. at 405-406.

Toward the end of 1999, Ms. Lott reevaluated Glass.  Id. at 399-402.  Her conclusions did not vary much from the previous

---

[7] The rubric "good progress" would be renamed as "satisfactory progress" and later as "progressing satisfactorily," but the standards for achieving it apparently have not changed.  Compare id. at 443, with id. at 433, and id. at 418.

assessment. She placed his "overall intellectual development within the Low Average range," and his "cognitive skills . . . at Low Average to Average levels, with no significant interscale discrepancy." Id. at 402. She also noted "an intra-individual strength in mathematics," while Glass's "[a]cademic skills in language arts (i[.]e. reading, writing) [were] significantly delayed, assessed at a first to second grade equivalent." Id. Finally, she found Glass to have "a well-adjusted profile," being a cooperative and socially appropriate adolescent. Id.

### 2. Other Evidence in the Record

#### a. Dr. Coronado's Assessment

The New York State Office of Temporary and Disability Assistance ("NYOTDA") referred Glass to Dr. Javier Coronado ("Dr. Coronado"), who performed a medical assessment on December 15, 2009. Id. at 276-277. In his evaluation, Dr. Coronado noted the following: (i) Glass "does not experience any chest pains or palpitations"; (ii) "[h]e is able to walk a couple of blocks without difficulty as well as climb a couple of flights of stairs"; (iii) he "cannot lift heavy things or participate in strenuous activities"; (iv) it had been "'months' since [the] last attack"; and (v) Glass used to have "[a]bout two attacks per year." Id. at 277. Dr. Coronado concluded that the overall prognosis was good, and that "[Glass] ha[d] no limitations sitting, standing, bending, kneeling, reaching, handling

objects, hearing, seeing or speaking.  [He] ha[d] mild limitations walking, climbing stairs, lifting and carrying." Id. at 280.

### b.  Dr. Kuntz's Assessment

The NYOTDA also referred Glass to Dr. Todd Kuntz ("Dr. Kuntz"), who performed another medical assessment focused on Glass's cognitive impairment on January 9, 2010.  See id. at 284-290.  After performing a series of tests, Dr. Kuntz concluded that Glass: (i) "appear[ed] to be capable of understanding and following simple to moderately complex verbal instructions"; (ii) "appear[ed] to be able of performing some complex tasks independently"; (iii) was fairly able "to sustain attention and concentration"; (iv) "appear[ed] to have the ability to regularly attend a routine and maintain a schedule"; and (v) "appear[ed] to be able to relate and interact appropriately with others."  Id. at 288.  Furthermore, Dr. Kuntz observed that Glass seemed "intellectually capable of managing his funds in his best interests, but may need assistance in writing checks or budgeting due to his math difficulties."  Id. at 288-89.  Finally, Dr. Kuntz established a poor prognosis for improvement, noting that Glass's "cognitive status is not likely to spontaneously improve."  Id. at 289.

### c. Dr. Ferrin's Assessment

On January 26, 2010, at the request of the NYOTDA, Dr.
Ferrin[8] completed a "Psychiatric Review Technique" form regarding
Glass's mental impairment. Id. at 291-303. Dr. Ferrin checked
a box on the evaluation form to indicate that Glass's impairment
was "[n]ot [s]evere." Id. at 291. Dr. Ferrin categorized
Glass's impairment as an "[a]ffective [d]isorder." Id.
Regarding such a disorder, Dr. Ferrin checked a stating that
"[a] medically determinable impairment is present that does not
precisely satisfy the diagnostic criteria [listed] above" on the
form. Id. at 294. Finally, Dr. Ferrin marked "[n]one" or
"[n]ever" for Glass's functional limitations as to (i)
restriction of activities of daily living; (ii) difficulties in
maintaining social functioning; (iii) difficulties in
maintaining concentration, persistence, or pace; and (iv)
repeated episodes of deterioration. Id. at 301. Dr. Ferrin
ultimately concluded that Glass's impairment was not severe.
Id. at 303.

### d. Glass's Testimony

Glass testified at the administrative hearing about his
impairments, professional experiences, and daily life
activities. Id. at 32-63. Glass testified that he graduated
from high school with an individualized program diploma, as he

_____

[8] Dr. Ferrin's first name does not appear in the record.

had a learning disability.  Id. at 38.  He said that he had a
second grade, first quarter reading level.  Id.  As to his
writing skills, Glass said he had trouble spelling.  Id.
Regarding math, Glass stated he could add and subtract, but
"[w]hen it gets into times tables and word problems . . . is
where [he has] a hard time."  Id.  Glass also told the hearing
officer he had completed an auto mechanic vocational course,
having used the knowledge acquired therein when he worked as an
auto mechanic.  Id. at 39.  About this professional experience,
Glass explained that he worked as a tire technician at Kost Tire
in Saratoga.  Id. at 40.  There, his main duty was to change
tires, but he was also responsible for, inter alia, doing oil
changes and cleaning the shop.  Id.  He explained he was let go
from Kost Tire after changing his pacemaker, because the company
considered it risky to keep him.[9]  Id. at 40-41.  Prompted by the
hearing officer to talk about other professional experiences,
Glass testified he had worked at a cleaning company, at a
restaurant, and also had had other jobs.  Id. at 41.  Glass
further explained that in some of those previous jobs he was let
go because of his heart condition.  Id.

_____

[9] Glass had some confusion about the date he was let go from
Kost Tire, after replacing his pacemaker.  See id. at 40, 44-46.
That is not relevant, however, because, in his decision, the
hearing officer acknowledged that the disability onset date was
December 8, 2007, the date most favorable to Glass.  Id. at 19.

As to his heart condition, Glass said he often had episodes where "[his] heart [would] act up," and he would have to go to the hospital and stay there for about a week.  Id. at 41-42.  He told the hearing officer that, because these episodes would happen often, his employers eventually decided to fire him.  See id. at 42.  Asked by the hearing officer to describe those episodes, Glass said that even in the absence of any type of stimulation, his heart would suddenly "start racing like [he were] running circles around the room."  Id.  He also testified that in such situations, he would not become short of breath or tired, but he felt as if he were running without stopping.  Id. He further explained that those episodes had nothing to do with problems in his pacemaker, and were rather a result of his Wolff-Parkinson-White syndrome.  Id.

Regarding his attempts to work after the alleged beginning of the disability, Glass testified that he applied for a job at Wal-Mart to do shipping and receiving, but would not be hired because of his heart condition.  Id. at 44-46.  Asked by the hearing officer why he chose not to apply for a cashier position, Glass explained he was not "fast enough with money" and recounted a previous professional experience at a garage, where he was fired for being unable to deal with the credit card machine and for his difficulties counting money.  Id. at 47. Glass related these shortcomings to his learning disability.

Id. When further asked why he did not apply for a greeter position at Wal-Mart, Glass stated it was a part-time job that would not provide him with enough income to keep up with his family's needs. Id. at 47-48.

Urged by the hearing officer to describe his professional limitations, Glass explained he felt "a little run[ ]down" after his heart had acted up, while maintaining that he did not suffer pain throughout the day. Id. at 48. He also told the hearing officer that his heart condition, together with his learning disability, prevented him from working. Id.

Talking about his daily routine, Glass mentioned that his doctor had not given him any exercise restriction and urged him to follow a "normal daily routine." Id. at 50. Accordingly, Glass informed the hearing officer that he would wake up, help feed his daughter, and do chores around the house, such as vacuuming, dusting, and sweeping. Id. at 50-51. Asked by the hearing officer whether he could cook, take care of his own personal hygiene, and dress himself, Glass responded affirmatively. Id. at 51. Asked about his hobbies, Glass informed the hearing officer that he liked to look at – not read – car magazines and build old car models, while stating he could no longer do the latter because of financial constraints. Id. at 52. As to his exertion levels, Glass told the hearing officer he could walk for about an hour, but might have to stop

for a while.  Id. at 53.  Glass also said he had some difficulty

going up stairs.  Id.  Besides that, Glass denied having any

mobility problems.  Id. at 54.  When questioned by his attorney,

Glass explained he had lifting restrictions on his left side due

to the placement of his pacemaker, but none on his right side.

Id. at 56.  He also stated that, when doing house chores, his

pace was a bit slower compared to a normal person's.  Id. at 58.

As to cooking, Glass testified that he was not able to read the

recipes – which his girlfriend would do – while commenting he

had "a hard time remembering measurements . . . how to break

them down, and add them together."  Id.  Finally, Glass said

that, while he had a driver's license and was able to drive

without any limitation, id. at 37, he had trouble reading some

road signs, limiting his ability to drive in unknown areas.  Id.

at 61-62.

### C.  Jurisdiction

This Court retains jurisdiction over this action pursuant

to 42 U.S.C. sections 405(g) and 1383(c)(3), granting judicial

review of the Commissioner's final orders and decisions.  42

U.S.C. §§ 405(g), 1383(c)(3).  The action was brought in the

district court for the judicial district in which Glass resides,

meaning venue is appropriate.  Compl. 2.

## II.  LEGAL STANDARD

### A.    Standard of Review

When reviewing the Commissioner's decision, the District Court makes two inquiries: whether the decision was based on the correct legal standards and whether it was supported by substantial evidence.  42 U.S.C. § 405(g); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).  The Supreme Court has defined "substantial evidence" as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)) (internal quotation marks omitted).

Legal decisions are reviewed de novo, and the Court may not affirm a denial of benefits "where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards, even if the ultimate decision may be arguabl[y] supported by substantial evidence." Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)).  Because disability benefits proceedings are non-adversarial in nature, the hearing officer has an affirmative duty to develop the record, regardless of whether the claimant is represented by counsel. Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting

Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755
(2d Cir. 1982)).  Furthermore, the hearing officer "must set
forth the crucial factors justifying his findings with
sufficient specificity to allow a court to determine whether
substantial evidence supports the decision."  Gravel v.
Barnhart, 360 F. Supp. 2d 442, 444-45 (N.D.N.Y. 2005) (Sharpe,
J.).

    Remand is appropriate where the administrative record
contains gaps and further findings would "plainly help to assure
the proper disposition of [the] [disability] claim."  Butts v.
Barnhart, 388 F.3d 377, 385 (2d Cir. 2004) (first alteration in
original) (quoting Rosa v. Callahan, 168 F.3d 72, 83 (2d Cir.
1999)) (internal quotation marks omitted), as amended on reh'g in
part, 416 F.3d 101 (2d Cir. 2005).  The Court should only
reverse the Commissioner's decision and remand for a calculation
of benefits when "the record is 'sufficiently complete' and
provides 'persuasive evidence of total disability,' thus
rendering further proceedings pointless."  Manago v. Barnhart,
321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (quoting Williams v.
Apfel, 204 F.3d 48, 50 (2d Cir. 1999)).

    **B.    Social Security Disability Standard**

    To be disabled within the meaning of the Social Security
Act, an individual must be "[unable] to engage in any
substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

### 1. The Five-Step Procedure for Determining Disability

The Social Security Administration has established a five-step procedure for determining whether a claimant is disabled within the meaning of the Social Security Act. 20 C.F.R. § 404.1520. The Commissioner must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or medically equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1") and meets the duration requirement such that the claimant is per se disabled; (4) whether the claimant has the residual functional capacity to perform his past work; and (5) whether the claimant has the residual functional capacity to do any other work, in light of his age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(i)-(v).

The claimant bears the burden of proving the disability requirements of the first four steps, and the Commissioner bears the burden on the fifth step. Rosa, 168 F.3d at 77-78. Therefore, after the claimant has successfully established all

the previous steps, it is up to the Commissioner to show that the claimant is capable of performing "substantial gainful work" (besides his prior work) that exists in the national economy.[10] Id.

## 2. Mental Impairment Evaluation

The Social Security Administration has also promulgated "a special technique [to be followed] at each level in the administrative review process" when dealing with mental impairments. 20 C.F.R. § 404.1520a. The Second Circuit has established the framework for applying this special technique, following pari passu the Social Security Administration's regulation:

> This technique requires the reviewing authority to determine first whether the claimant has a "medically determinable mental impairment." § 404.1520a(b)(1). If the claimant is found to have such an impairment, the reviewing authority must "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c)," § 404.1520a(b)(2), which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. § 404.1520a(c)(3). According to the regulations, if the degree of limitation in each of the first three areas is rated "mild" or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not "severe" and will deny benefits. § 404.1520a(d)(1). If the claimant's mental impairment is severe, the reviewing authority will

---

[10] The Social Security Administration has promulgated medical-vocational guidelines to aid this inquiry. 20 C.F.R. § 404, Subpart P, app. 2.

first compare the relevant medical findings and the
functional limitation ratings to the criteria of
listed mental disorders in order to determine whether
the impairment meets or is equivalent in severity to
any listed mental disorder. § 404.1520a(d)(2). If
so, the claimant will be found to be disabled. If
not, the reviewing authority will then assess the
claimant's residual functional capacity.
§ 404.1520a(d)(3).

Kohler v. Astrue, 546 F.3d 260, 265-66 (2d Cir. 2008) (internal

footnote omitted). The application of this special technique

must properly be documented, "pursuant to the [hearing

officer]'s duty to develop the record." Hernandez v. Astrue,

814 F. Supp. 2d 168, 181 (E.D.N.Y. 2011).

## III. THE HEARING OFFICER'S DECISION

Applying the five-step procedure mentioned above, the

hearing officer first found that Glass had not engaged in

substantial gainful activity since the alleged onset date of his

disability – December 8, 2007.[11]  Admin. R. 19.  Next, the

hearing officer determined that Glass had the following severe

impairments: a learning disability and Wolff-Parkinson-White

syndrome.  Id.  The hearing officer concluded, however, that

those impairments, by themselves or combined, did not meet or

medically equal one of the impairments listed in Appendix 1.

Id. at 20.  The hearing officer then determined that, while

Glass did not have the residual functional capacity to perform

_____

[11] The hearing officer found that the period during 2008
when Glass worked inflating bounce houses represented "an
unsuccessful work attempt."  Id. at 19.

20

his past work, id. at 24, he still had the "residual functional capacity to perform the full range of light work defined in 20 CFR [sections] 404.1567(b) and 416.967(b). [Glass]'s IQ of 86 places his intelligence in the low average range, but he is capable of handling all the basic mental demands of light, unskilled work." Id. at 21.

The hearing officer based his conclusions on the facts that Glass "was capable of understanding and following simple to moderately complex verbal instructions and performing some complex tasks independently." Id. at 23. The hearing officer further noted that Glass was able regularly to "attend a routine, maintain a schedule, and relate and interact appropriately with others." Id. Also, the hearing officer found mild limitations in Glass's ability to walk, climb stairs, lift and carry, and no limitations whatsoever "in sitting, standing, bending, kneeling, reaching, handling objects, hearing, seeing, or speaking." Id. The hearing officer then concluded that "[c]onsidering [Glass]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform." Id. at 24. Accordingly, the hearing officer did not find Glass to be disabled from December 8, 2007 to January 6, 2011 – the date of his decision. Id. at 25.

## IV.  ANALYSIS

The hearing officer found in Glass's favor at steps one, two and four, concluding that Glass was not engaged in substantial gainful activity, suffered from severe impairments, and was unable to perform his relevant past work.[12]  Admin. R. 18-25.  Glass presents three arguments stemming from the hearing officer's analysis at step five: (i) that the hearing officer committed reversible error in failing to find the combination of impairments disabling, Pl.'s Br. 11; (ii) that the hearing officer committed reversible error in holding Glass had the residual functional capacity to perform light work and in applying the medical-vocational guidelines in finding Glass not disabled, id. at 13; and (iii) that the hearing officer's decision is against the substantial weight of the evidence and incorrect as matter of law, id. at 18.  The Court shall address each of these points, albeit in a different order than that in which Glass raises them.

### A.  The Hearing Officer's Assessment of Glass's Residual Functional Capacity Was Supported by Substantial Evidence

After finding that the claimant's impairments or combination of impairments do not meet or equal the Appendix 1

---

[12] The hearing officer found against Glass at step three, see Admin. R. 20, but this only means that Glass cannot be found per se disabled and that the hearing officer must then continue to evaluate whether Glass is disabled under steps four and five.

criteria, and prior to going over steps four and five of the

disability evaluation procedure, the hearing officer must

determine the claimant's residual functional capacity.  20

C.F.R. § 404.1520(a)(4), (e); see also id. § 404.1545.  The

residual functional capacity found in this assessment will then

be used to determine the outcome of steps four and five.  Id.

As in all other steps of his evaluation, the hearing officer

must set forth his determination of a claimant's residual

functional capacity with sufficient specificity for the Court to

determine whether it is supported by substantial evidence.

Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) (remanding

where court was unable to determine whether hearing officer's

conclusory residual functional capacity finding was supported by

substantial evidence).

Although bound to consider the claimant's reports of pain

and other limitations, 20 C.F.R. § 404.1529(d)(4), the hearing

officer is "not required to accept the claimant's subjective

complaints without question; he may exercise discretion in

weighing the credibility of the claimant's testimony in light of

the other evidence in the record."  Genier v. Astrue, 606 F.3d

46, 49 (2d Cir. 2010).  In assessing subjective claims of pain,

the hearing officer must follow a two-step procedure.  20 C.F.R.

§ 404.1529.  First, the hearing officer must "decide whether the

claimant suffers from a medically determinable impairment that

could reasonably be expected to produce the symptoms alleged."

Genier, 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(b)).  If the
answer to the first inquiry is positive, the hearing officer
must then determine "the extent to which [the claimant's]
symptoms can reasonably be accepted as consistent with the
objective medical evidence and other evidence of record."  Id.
(alteration in original) (quoting 20 C.F.R. § 404.1529(a))
(internal quotation marks omitted).

Here, considering Glass's exertional limitations, the
hearing officer found Glass had "the residual functional
capacity to perform the full range of light work as defined in
20 C.F.R. [sections] 404.1567(b) and 416.967(b)."  Admin. R. 21.
Moving on to the nonexertional limitations, the hearing officer
found Glass had "no deficits that would preclude him from
performing unskilled work as defined in 20 C.F.R. [sections]
404.1568(a) and 416.968(a)."  Id. at 24.  In doing so, the
hearing officer observed that Glass's IQ "places his
intelligence in the low average range, but he is capable of
handling all the basic mental demands of light, unskilled work."
Id. at 21.

The relevant regulation defines light work as follows:

Light work involves lifting no more than 20 pounds at
a time with frequent lifting or carrying of objects
weighing up to 10 pounds.  Even though the weight
lifted may be very little, a job is in this category
when it requires a good deal of walking or standing,

24

or when it involves sitting most of the time with some
pushing and pulling of arm or leg controls.  To be
considered capable of performing a full or wide range
of light work, you must have the ability to do
substantially all of these activities.  If someone can
do light work, we determine that he or she can also do
sedentary work, unless there are additional limiting
factors such as loss of fine dexterity or inability to
sit for long periods of time.

20 C.F.R. § 404.1567(b).  Unskilled work, meanwhile, is

thus defined:

Unskilled work is work which needs little or no
judgment to do simple duties that can be learned on
the job in a short period of time.  The job may or may
not require considerable strength.  For example, we
consider jobs unskilled if the primary work duties are
handling, feeding and offbearing (that is, placing or
removing materials from machines which are automatic
or operated by others), or machine tending, and a
person can usually learn to do the job in 30 days, and
little specific vocational preparation and judgment
are needed.  A person does not gain work skills by
doing unskilled jobs.

20 C.F.R. § 404.1568(a).

The hearing officer carefully laid out the reasons why he

had reached the conclusion that Glass could engage in light,

unskilled work.  In doing so, he also explained why he was

discrediting some of Glass's subjective claims of limitation.

Essentially, the hearing officer applied the two-step procedure

mentioned above and found that, although "[Glass's] medically

determinable impairments could reasonably be expected to cause

the alleged symptoms . . . [Glass's] statements concerning the

intensity, persistence and limiting effects of these symptoms

are not credible to the extent they are inconsistent with the .
. . . residual functional capacity assessment." Admin. R. 22.

The hearing officer then proceeded to detail his findings.
He mentioned the examinations conducted by different physicians
and a psychologist to conclude that Glass could walk a short
distance, climb a couple of flights of stairs without
difficulty, walk on heels and toes, and perform a full squat.
Id. at 22 (citing Dr. Coronado's report, while giving it
"moderate weight due to its vagueness," id. at 23).  The hearing
officer also noted that Glass used no assistive device and
exhibited a normal gait.  Id. at 22.  As to the mental
limitations, the hearing officer noted that Glass "was able to
complete five digits forwards and four digits backwards," id.,
and "was capable of understanding and following simple to
moderately complex verbal instructions and performing some
complex tasks independently. . . . [Glass's] ability to sustain
attention and concentration was fair and . . . he was able to
regularly attend a routine, maintain a schedule, and relate and
interact appropriately with others."  Id. at 23 (citing Dr.
Kuntz's report, while giving it "significant weight," id.,
because of its consistency with Dr. Coronado's assessment).
Accordingly, the hearing officer stated that "[Glass's] learning
disability does not result in any deficits that would preclude
him from performing light, unskilled work, as demonstrated by

his activities of daily living including cooking, driving, and working on cars." Id.

A review of the administrative record shows that substantial evidence supports the hearing officer's determination of Glass's residual functional capacity. In his assessment, focused on Glass's exertional limitations, Dr. Coronado concluded that "[Glass] has no limitations sitting, standing, bending, kneeling, reaching, handling objects, hearing, seeing or speaking. [He] has mild limitations walking, climbing stairs, lifting and carrying." Id. at 280. Dr. Coronado also made a positive overall prognosis for Glass. Id. As to the nonexertional limitations, the assessment provided by Dr. Kuntz concluded that Glass: (i) "appear[ed] to be capable of understanding and following simple to moderately complex verbal instructions"; (ii) "appear[ed] to be capable of performing some complex tasks independently"; (iii) was fairly able "to sustain attention and concentration"; (iv) "appear[ed] to have the ability to regularly attend a routine and maintain a schedule"; and (v) "appear[ed] to be able to relate and interact appropriately with others." Id. at 288. Dr. Kuntz, however, noted that Glass's "cognitive status [was] not likely to spontaneously improve." Id. at 289. As a result, and considering that the evidence provided by the other doctors consistently supports the residual functional capacity

27

determined by the hearing officer, this Court finds no error in his determination.

This Court observes, at this point, that substantial evidence also supported the hearing officer's finding that "[Glass's] allegations regarding the intensity, persistence, and limiting effects of his symptoms are not fully credible." Id. at 23. As a matter of fact, during his testimony, Glass was not very assertive about any specific limitations. He acknowledged that he did not have any significant exertional limitations. His main contention regarded the nonexertional limitations, as summarized by Glass's brief:

> [Glass] testified he could add and subtract but had difficulty with multiplication. From this we could infer he has similar difficulty with division. [Glass] also testified he has difficulty remembering measurements and how to break them down and add them together. These limitations indicate that plaintiff would be unable to perform the multiplication and division necessary to perform [certain work]. His difficulties with measurements also show that he would be unable to perform operations with cup, pint, quart, ounce and pound, as required by [this work].
> As far as his ability to read, [Glass] indicated his mental limitations prevent him from being able to write, because of difficulties with spelling. He further indicated he is able to read certain words by memorizing what the word looks like, such as the word "Chevy," but that he would not be able to spell a word such as "Lexus." Further, he had indicated he would be unable to spell such words as "hundreds" if he were to try to write a check. These fundamental spelling deficiencies are consistent with plaintiff's testimony that he has a second grade reading level. . . . These limitations indicate plaintiff would likely have difficulty meeting the [language] requirements [of a certain level of work].

Pl.'s Br. 14-15.  As the hearing officer observed, however, the limitations claimed by Glass in his testimony were inconsistent with the record, especially with the abovementioned assessment made by Dr. Kuntz.  Finally, contrary to Glass's allegations, Pl.'s Br. 13 ("[L]ight work generally makes use of an employee's abilities to gather or process information."), the type of light work specified by the hearing officer – unskilled – does not demand a level of cognitive sophistication inconsistent with the one shown by Glass.

This Court notes, finally, that Glass's daily activities undermine his claims.  He testified that that his doctor had not given him any exercise restriction and encouraged him to carry out a "normal daily routine."  Admin. R. 50.  Likewise, Glass said he helped take care of his daughter and did chores around the house, such as vacuuming, dusting, and sweeping.  Id. at 50-51.  Glass also affirmed he could cook, take care of his own personal hygiene, and dress himself.  Id. at 51.  These facts did not go unnoticed by the hearing officer, who stated that "[Glass's] allegations [were] not supported by . . . [his] activities of daily living."  Id. at 23.

Therefore, the Court affirms the hearing officer's credibility determination and finding of Glass's residual functional capacity.

**B. The Hearing Officer Did Not Commit Error in Applying the Medical-Vocational Guidelines in Finding Glass Not Disabled**

After finding the claimant's residual functional capacity, and concluding that such capacity is not sufficient to perform the claimant's past work, the question then becomes whether the claimant has the residual functional capacity to do any other work, in light of his age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). As previously mentioned, the burden is on the Commissioner to show that the claimant is capable of performing "substantial gainful work," alternative to his prior work, existent in the national economy. Rosa, 168 F.3d at 77-78. To that end, the Social Security Administration has promulgated medical-vocational guidelines to aid this inquiry. 20 C.F.R. § 404, Subpart P, app. 2.

In the present case, there is no dispute as to the fact that, due to his heart condition alone – an exertional impairment – Glass would be restricted to light work. The question remains, however, whether his learning disability – a nonexertional impairment – would restrict him even further, preventing him from performing the full range of light work. The hearing officer held that the learning disability would not limit Glass in any way in the spectrum of light, unskilled work. Admin. R. 24. Accordingly, the hearing officer used the medical-vocational guidelines in determining Glass's residual

functional capacity to perform alternative substantial gainful

work which exists in the national economy.  Id. at 24-25.  Glass

disagrees, claiming that his nonexertional limitations

significantly diminish his ability to work, and that the

intellectual demands of some of the work within the applicable

range are too complex for him.  Pl.'s Br. 14-15.

The framework for approaching cases where exertional and

nonexertional limitations are present has been laid out by the

Second Circuit:

> In the ordinary case, the Commissioner meets his
> burden at the fifth step by resorting to the
> applicable medical vocational guidelines (the grids).
> The grids take into account the claimant's residual
> functional capacity in conjunction with the claimant's
> age, education and work experience.  Based on these
> considerations, the grids indicate whether the
> claimant can engage in any substantial gainful work
> existing in the national economy.  Although the grid
> results are generally dispositive, exclusive reliance
> on the grids is inappropriate where the guidelines
> fail to describe the full extent of a claimant's
> physical limitations.  In particular, sole reliance on
> the grids may be precluded where the claimant's
> exertional impairments are compounded by significant
> nonexertional impairments that limit the range of
> sedentary work that the claimant can perform.  In
> these circumstances, the Commissioner must introduce
> the testimony of a vocational expert (or other similar
> evidence) that jobs exist in the economy which
> claimant can obtain and perform.
>
> However, the mere existence of a nonexertional
> impairment does not automatically require the
> production of a vocational expert nor preclude
> reliance on the guidelines.  Rather, a more
> appropriate approach is that when a claimant's
> nonexertional impairments significantly diminish his
> ability to work - over and above any incapacity caused
> solely from exertional limitations - so that he is

> unable to perform the full range of employment
> indicated by the medical vocational guidelines, then
> the Secretary must introduce the testimony of a
> vocational expert (or other similar evidence) that
> jobs exist in the economy which claimant can obtain
> and perform. A claimant's work capacity is
> significantly diminished if there is an additional
> loss of work capacity that so narrows a claimant's
> possible range of work as to deprive him of a
> meaningful employment opportunity.

Roma v. Astrue, 468 F. App'x 16, 20-21 (2d Cir. 2012) (citations

omitted) (internal quotation marks omitted) (alterations

omitted).

As this Court noted on the previous step of the analysis,

the hearing officer, when assessing Glass's residual functional

capacity, concluded that "[Glass's] learning disability does not

result in any deficits that would preclude him from performing

light, unskilled work." Admin. R. 23. As a result, because

Glass's nonexertional impairments do not significantly diminish

his ability to work, the hearing officer's decision to apply the

medical-vocational guidelines was in tune with the framework set

forth in Roma.

In fact, the hearing officer duly followed the procedure

established by the Social Security Administration; as to this

specific topic, the hearing officer noted that: (i) Glass was

twenty-five years old, "which is defined as a younger individual

age 18-49, on the alleged disability onset date"; (ii) Glass had

"a high school education and [was] able to communicate in

English"; and (iii) "[t]ransferability of job skills [was] not
an issue in this case because [Glass]'s past relevant work [was]
unskilled." Id. at 24. The hearing officer then concluded
that, because Glass was able to perform the full range of light
work, and considering that his past work was already unskilled,
"he retain[ed] the ability to perform other work that exists in
significant numbers in the national economy." Id. at 24-25; see
also 20 C.F.R. 404.1520(a)(4)(v).

In making this decision, the hearing officer specifically
relied on Medical-Vocational Rule 202.20. Admin. R. 25. This
rule mandates a finding of no disability when the claimant is a
younger individual with a high school education performing
unskilled work. 20 C.F.R. § 404, Subpart P, app. 2. Because
the hearing officer properly found that each element of this
rule applied in this case (as discussed above in this section
and in the section of the opinion dealing with the existence of
substantial evidence), use of the rule to find Glass not
disabled was appropriate.

This Court makes one important point here, regarding
Glass's educational level. In his assessment, the hearing
officer simply mentioned that Glass had a high school education.
Admin. R. 24. In doing so, the hearing officer failed to
consider the fact that Glass graduated in high school with an
individualized program diploma because of his learning

disability.  This error by the hearing officer could control the outcome here, because, as a rule, the Social Security Administration "generally consider[s] that someone with [a high school education and above] can do semi-skilled through skilled work."  20 C.F.R. § 404.1564(b)(4).  That conclusion would not fit Glass's case, however, because of his learning disability, reflected in the individualized program diploma.

The hearing officer's mistake does not impact the outcome of the case, however, for the simple reason that he assessed Glass's residual capacity solely for unskilled work, considering that Glass's previous work experience was limited to unskilled jobs.  Admin. R. 24-25.  Therefore, although the hearing officer's assessment of Glass's educational level could have led to the mistaken conclusion that he was able to perform semi-skilled through skilled work, the fact is that Glass's residual functional capacity was limited to light, unskilled work, consentaneous to his actual limitations.

In the end, the hearing officer did not err in his conclusion that "Glass has severe impairments that prevent him from performing past relevant work, but he retains the ability to perform other work that exists in significant numbers in the national economy."  Id. at 25.  Accordingly, this Court dismisses the complaint and affirms the determination of the Commissioner.

**C.    The Hearing Officer Did Not Commit Error by Failing to Analyze Glass's Impairments in Combination**

Glass also argues that the hearing officer committed reversible error by analyzing Glass's impairments independently rather than in tandem.  Pl.'s Br. 11-13.  Glass argues that the hearing officer ignored the notion that together his impairments constitute a disability where neither would when viewed alone: while his heart condition would permit him to perform work that does not involve physical labor, his learning disability only allows him to perform jobs that do not require high-level thinking (i.e., jobs involving the very kind of physical labor his heart condition forbids).  In short, he argues that his impairments are more than the sum of their parts.

This argument, however, does not match the hearing officer's ultimate conclusion.  The hearing officer did indeed note that each of Glass's impairments creates a different kind of limitation: he found that Glass's heart problems limit him to light work, while his learning disability limits him to unskilled work.  Admin. R. 24.  In making his ultimate conclusion, the hearing officer combined these two limitations to find that Glass was capable of work that was both light and unskilled, id. at 21, suggesting that the hearing officer did indeed view these impairments as a combination rather than as

independent.  Accordingly, Glass's argument that the hearing officer ignored this idea does not hold water.

Nor can Glass argue that this is mere wordplay that does not reflect the realities of his conditions: the hearing officer's decision evinces his consideration of this matter in deeper ways as well.  In addition to combining the two limitations in the way described above, the hearing officer looked to Glass's activities of daily living in deciding that Glass was not disabled.  See id. at 23.  Unlike Glass's various doctors, each of whom prepared their reports on Glass's ability to work with an eye toward just one of his impairments, Glass carried out his activities of daily living while under the effects of both impairments working in conjunction.  Put differently, his everyday life gave the hearing officer a more holistic perspective than did the medical evidence in the record on its own.  Because the hearing officer based his decision at least in part on this holistic evidence rather than on two discrete bodies of evidence that did not necessarily consider the other, then, the Court rules that the hearing officer did adequately consider the question of whether Glass's impairments are more limiting in tandem than they are taken on their own.  Accordingly, the Court rejects Glass's argument on this point and declines to find that the hearing officer committed reversible error.

## V. CONCLUSION

For the foregoing reasons, the Court dismisses Glass's complaint, ECF No. 1, and affirms the decision by the Commissioner.

**SO ORDERED.**

_/s/ William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE